KING, Justice,
dissenting:
¶ 22. Because I believe that Officer Cox was not acting within the scope of his office or duty at the time the assault occurred, I respectfully dissent. I also believe this Court should address the Court of Appeals’ erroneous decision on an evi-dentiary issue; thus, I will also address the admission of lay testimony of a nurse who did not treat Bates.
¶ 23. First, it is necessary to expand on the majority’s recitation of facts. On June 25, 2011, into the early morning of June 26, 2011, Deputy James D. Cox, a patrol deputy with the Hinds County Sheriffs Department, was working off-duty as a security guard/bouncer for Reed Pierce’s. The bar manager instructed Cox to tell Bates to leave, and Cox complied. When Bates responded belligerently, Cox and two other security guards escorted Bates out of the building. The other two security guards were Jeremy Dolan and Matthew Gordon. On June 25, 2011, Dolan was employed as a mechanic at Gateway Tire and Service and as a security guard/bouncer at Reed Pierce’s, and he was not a law enforcement officer in June of 2011. In June 2011, Gordon was employed as a security guard at Reed Pierce’s. He testified that “that’s my job to get the last people out.” Cox also testified that, once they were standing outside, he “was tempted at that time to make an arrest, but I didn’t because as we were speaking to him, he was walking toward his vehicle, but he was still making threats back to us.” Cox did not testify as to the basis on which he would have made an arrest at that time.
¶ 24. Cox testified that after he, Bates, and the other two guards stepped outside, Reed Pierce’s locked its doors. Neither of the other two security guards testified that Reed Pierce’s locked the doors, and Gordon testified that he and Dolan went back inside Reed Pierce’s once Cox began pursuing Bates. It is clear from the record that, after Bates entered his vehicle, his gun discharged, although it is disputed whether the discharge was purposeful or accidental.
¶ 25. Bates was indicted for aggravated assault of a law enforcement officer acting within the “scope of his duty and office” pursuant to Mississippi Code Section 97-3-7(2)(b)(a).
¶ 26. At trial, Dana Sims, an attorney for the Sheriffs Department, testified regarding the department’s policies and procedures regarding off-duty work, as well as whether Cox had followed those procedures, despite the fact that she was not working for the Sheriffs Department in June 2011; thus she had no personal knowledge of the department’s policies and procedures at that time, an important issue, given that she was a fact witness, not an expert.[2] She testified that when depu *703 ties are off-duty, “they are still considered sheriffs deputies, therefore they do have their police powers.” She noted that, whether a deputy is “at home or if he’s driving down the street” he is “still a Hinds County sheriffs deputy.” Despite the fact that she was allegedly a fact witness, the State improperly referred to her as an “expert” on this issue. Sims further testified that the reasons behind allowing deputies to do off-duty work are 1) to give the deputies extra money, 2) for the benefit of the businesses and their patrons, B) and to give the Hinds County Sheriffs Department a larger presence in the county-
¶ 27. Bates then testified, as noted, that he and Cox did have words, that he left, as requested, and that the gun fired accidentally. He also testified that, after the gun fired, he had ringing in his ears and that it may have burned him. (“I thought — I guess — I don’t know if it burned — it burned me.”). He further testified that he looked at his arm and “notice[d] a little red rash but no wounds.” In response to this testimony, the State insisted on putting on a “rebuttal witness.” The State called Travis Williams, a nurse with the Hinds County Detention Center. Bates objected to his testimony multiple times. The court found that Bates “brought his medical condition into this trial and he accordingly has waived the medical privilege.” He also found that, because the defense asked to see a copy of the records from which the nurse was going to testify practically verbatim (as a proffer was made), that the defendant “waived the medical privilege as to those records.” The court ultimately found, during the course of multiple objections and arguments from the defendant, that “[t]he witness is not offering an expert witness opinion. He’s offering a medical lay fact analysis, and I believe it’s probative.”
¶ 28. Williams testified that he had “looked back at the records” for Bates. He also testified that he was “involved” in the care of Bates. He testified that his involvement was that he “noted off an order” on Bates when he went to see the doctor. However, he also admitted that this “involvement” in Bates’s care did not actually involve ever seeing Bates-Williams did not see or treat Bates in any way for the duration of the time that Bates was in the Hinds County Detention Center. Moreover, Bates was admitted to the jail on June 26, 2011, and Williams did not even “note off’ anything regarding Bates until June 29, 2011.
¶ 29. Williams testified that the intake and medical forms handed to him were of the “type of document that is regularly kept in the course of business at the Hinds County Detention Center.” He further agreed with the prosecutor that it is “the type of document that [he] refer[s] to that [he] ha[s] to look at in order to provide care.” The substance of his direct testimony is as follows:
Q. Okay. And what is the document.
A. . It’s the health screening form.
Q. Okay. Now, in the process of this health screening, does this document indicate that Mr. Bates had any obvious injury to either arm?
A. No, ma’am.
Q. Does this document indicate that Mr. Bates had any obvious rash or redness to any arm — either arm?
A. No, ma’am.
Q. Does this document indicate that on that day of June 26th, 2011, Mr. Bates *704 complained of needing medical treatment for either arm?
A. No, ma’am.
Q. Does this document from June 26th, 2011 indicate that Mr. Bates let anyone know that he has any type of injury to either arm?
A. No, ma’am.
Q. Okay. Now, at the bottom of that document, was Mr. Bates informed about the medical services that could be provided to him?
A. Yes, ma’am.
Q. How so? How did he indicate it? Well, let me go back. That’s a bad question.
Did Mr. Bates indicate that he knew of the medical services that were available to him?
A. Yes, ma’am.
Q. How did he indicate that?
A. He checked yes that he was informed.
Q. Did he sign the document?
A. Yes, ma’am.
Q. Okay. On that health screening form or intake form on June 26th, 2011, did Mr. Bates indicate that he had trouble with ringing in his ears?
A. No, ma’am.
Q. And on that date, did Mr. Bates indicated [sic] that he had any kind of pain or difficulty hearing?
A. No, ma’am.
Q. Okay. If you would, Nurse Williams, would you look through and see if at any point in time Mr. Bates made anyone aware of problems with rashes or redness of his arms?
A. (Witness reviewing document). No, ma’am.
Q. And as you were looking through that document, did you see that at any point in time, starting with June 26th, 2011 — whether or not Mr. Bates let anyone know that he had any problems with his ears ringing or hurting?
A. No, ma’am.
Q. Did Mr. Bates receive treatment for either the arm rash, burn, whatever, or ear problems while he was there?
A. No, ma’am.
Williams also admitted that everything to which he testified was simply what was on the document, and was not based upon any interactions between Williams and Bates.
¶ 30. The documents from which Williams essentially read include the “Health Screening Form” filled out on June 26, 2011, by Crystal Houston, a Hinds County Sheriffs Office “Screening Officer,” not a medical professional. It also includes a general “Jail Intake Report” which lists intake property and asks Bates to acknowledge that he knows how to ask for medical attention, also apparently filled out by Officer Crystal Houston. Also included is a “Suicide Prevention Screening” filled out by Crystal Houston and a “Pre-classification” form filled out by Crystal Houston. The packet also includes a “Medical Encounter Record” dated June 30, 2011, a “Doctor’s Orders” with notes dated June 28, 2011, and June 30, 2011, a “Health Services Request Form,” and a “Special Diet Order.” Williams primarily read from the intake forms from June 26, 2011.
¶ 31. On cross-examination, Bates made clear that Williams never saw him, and noted that the forms were rather vague regarding medical care. On redirect examination, despite Williams never having seen Bates, and despite Williams not even “noting off’ on Bates’s forms until June 28, 2011, the following exchange occurred:
Q. Could you just look back through the records one more time and tell me whether or not anywhere in *705 these records there’s an indication by Mr. Bates that he had injuries to his arms and/or ears on June 26, 2011 or afterward.
A. (Witness reviewing document). No, ma’am.
¶ 32. During closing arguments, Bates argued that the State had not proven that Cox was acting within the duty and scope of his office as a law enforcement officer. The State continued to argue that Cox was acting within the duty and scope of his office as a law enforcement officer twenty-four hours a day, seven days a week. It even stated that “keep in mind that 24/7 on duty coming from the attorney for the Hinds County Sheriffs Department, that proves that Cox was within the course and scope of his duty.”
¶ 38. After the jury found Bates guilty of simple assault on a law enforcement officer, the trial court sentenced Bates to five years in prison, the maximum penalty for the crime of which he was convicted, with the reasoning that, despite Bates’s clean past and family members vouching for him, the court needed to deter others from committing this crime, with the court noting multiple times that the “jury gave him a break” by not convicting him of aggravated assault.[3]
¶ 34. Bates appealed, arguing that the evidence was insufficient to support the element that Cox was acting as a law enforcement officer and that the trial court erred in allowing Nurse Williams to testify as to the jail intake record. The State, as it did at trial, argued that Cox was within the scope of his office and duty as a law enforcement officer because officers are always on duty and also because Cox was wearing his uniform, and furthermore, because his outside employment for Reed Pierce’s was approved by the Sheriffs Department. The State further argued that Nurse Williams’s testimony was admissible because the “testimony was within Williams’fs] personal knowledge of Batesfs] medical condition while Bates was in the Hinds County Detention Center.” The Court of Appeals affirmed the trial court’s judgment. Bates v. State, — So.3d -, 2014 WL 3824038, No.2013KA-00097-COA (Miss.Ct.App. Aug. 5, 2014). The majority now affirms the Court of Appeals’ holding that nothing in Cox’s private employment prevented him from exercising his police powers. Maj. Op. ¶¶ 6-8, 12. The majority further agrees with the Court of Appeals that Cox was working in uniform with the approval of the Sheriffs Department, and that his initial request was on behalf of Reed Pierce’s, but “Bates’s hostile reaction triggered Cox to switch into law-enforcement mode.” Maj. Op. at ¶ 8. The Court of Appeals also held that the trial court did not abuse its discretion in admitting Nurse Williams’s testimony because Williams was “part of the team responsible for Bates’s medical care that night. In this role, Williams had personal knowledge of the jail’s procedures for providing medical care for new inmates who require it.”[4] Bates, *706 172 So.3d at 811-12, 2014 WL 3824038 at *5. It found that the fact that Williams was only “indirectly” involved in Bates’s care went to the weight and credibility of the testimony, not to the admissibility. Id. at *6, 812-13. The majority does not address this issue.

ANALYSIS

1. Sufficiency of the Evidence

¶35. Because the standard of review was not outlined by the majority, this opinion will detail it. In reviewing a conviction, the evidence is sufficient if, in light of the standard of proof of beyond a reasonable doubt, any rational trier of fact could have found the element at issue or elements of the crime beyond a reasonable doubt. Gilpatrick v. State, 991 So.2d 130, 133-34 (Miss.2008). However, if reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty, the Court must reverse. Id. Determining what standard courts must apply to ascertain when the elements of assault on a law enforcement officer are met is a legal question and is examined de novo. Smothers v. State, 741 So.2d 205, 206 (Miss.1999).
¶ 36. Bates was convicted of simple assault on a law enforcement officer. The applicable portion of the assault statute in effect at the time of the incident[5] provided that “[a] person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; ... or (c) attempts by physical menace to put another in fear of imminent serious bodily harm[.]” Miss. Code Ann. § 97-3-7(1) (Supp.2010). The punishment is enhanced when the simple assault is committed on a law enforcement officer who is “acting within the scope of his duty, office or employment.” Id. (“However, a person convicted of simple assault (a) upon a ... law enforcement officer ... while such ... law enforcement officer ... is acting within the scope of his duty, office or employment ... shall be punished by a fine of not more than One Thousand Dollars ($1,000.00) or by imprisonment for not more than five (5) years, or both.”). Bates does not challenge the evidence to support the simple assault elements, nor does he challenge whether Cox was a law enforcement officer. What he challenges is the sufficiency of the evidence supporting the element that Cox was “acting within the scope of his duty, office or employment.” Because, as the majority notes, it is undisputed that Cox was not acting within the scope of his “employment” as a law enforcement officer, the issue is necessarily whether sufficient evidence exists as to whether Cox was acting within the scope of his “duty” or “office.”
¶ 37. The State argued on appeal, as it did at trial, without citation to any law or policy, that Hinds County Sheriffs deputies are subject to call and duty at any time, twenty-four hours a day, seven days a week. It suggests, multiple times both in trial and on appeal, that a deputy is always acting within the scope of his employment, duty, or office under the assault statute, simply because he is “always on call,” without bothering to back up the assertion that he is always on call. The State’s position is obviously incorrect, and *707 would lead to absurd results.[6] The statute clearly contemplates that the assault be under circumstances in which the victim is clearly acting as a law enforcement officer, not in which he is acting as an average civilian who happens to also be employed as a law enforcement officer. The majority does not appear to completely embrace the State’s position (the position the State has advocated during the trial and appeal of this case), yet it posits that, because Cox was wearing his uniform, and because he had permission to work in private employment, this somehow renders him as acting within the scope of his duty or office.[7] This does not explain how his actions at the time of the assault, as is required by the plain language of the statute, are within the scope of his duty and office; it simply relies on his appearance.
¶ 38. The majority completely ignores this Court’s controlling precedent regarding the standard we must apply to determine whether a police officer is within the scope of his office or duty under the assault statute. In Callahan v. State, this Court addressed the issue of an assault on someone who may or may not have been acting as a law enforcement officer, and interpreted Section 97-3-7.[8] Callahan v. State, 419 So.2d 165 (Miss.1982). In Callahan, the Court notes that the town of Tchula, Mississippi, had been beset with “confusion and troubles.” Id. at 167. Tchula was governed by a mayor and five alderman. Id. Most of the police officers in town quit due to a failure to be paid; however, James Harris, the victim of assault in this case, remained in his job as a police officer. Id. On April 30, 1980, two of the alderman called a special meeting, pursuant to their statutory authority to do so. Id. The agenda of the special meeting included electing a mayor pro-tem and a chief of police. Id. Jim Andrews, a former Tchula police chief, assumed the duties of police chief that night, and inconsistencies in the testimony are abundant as to “the manner and authority under which this was done.” Id. It appears that he was appointed acting chief of police by a majority of the Board of Aldermen that night, but without the agreement of two aider-men and the mayor; although the legality of the appointment and whether it actually occurred, were disputed. Id. at 168-70. One witness testified that the only acting policeman hired by the Board was Harris. Id. at 169. Andrews testified that he asked Harris to work the night shift that night, and that he was thus on-duty. Id. at 170. Harris, who had been a town policeman for four years, complied. Id. When the Mayor, Eddie James Carthan, discovered that Andrews had taken over the police department after the meeting, he gathered members of the police department, a member of the Board of Aldermen, and people whom Carthan designated as “auxiliary policeman,” and they all went to the town hall, which included the police *708 department, with weapons. Id. at 167-68. A “tussle” ensued, during which Andrews was grazed by a bullet. Id. at 168-70. The mayor and his group were prosecuted for assault on Harris, who was at the police department when the group arrived. Id. at 171. The mayor testified that Harris was not on duty the night that the incident occurred. Id. at 174.
¶ 39. The defendants claimed that they were entitled to a peremptory instruction because, they argued, the State failed to prove that Harris was a police officer who was acting within the scope of his duty. Id. at 174. The Court noted that it was undisputed that Harris was a police officer, thus the only question was whether he was “on duty.” The Court determined that the standard of whether Harris was acting “within the scope of his office as a full-time policeman-depends on whether or not he was performing a legal duty associated with his office as distinguished, from engaging in a personal frolic of his own.” Id. at 174-75. The Court determined that enough conflicting information existed as to whether Andrews was properly appointed and thus had properly ordered Harris to be on-duty to render Harris’s status a jury question. Id. at 175. Thus, whether Officer Cox was acting within the scope of his duty or office depends on whether he was performing a legal duty associated with his office, or was engaging in a personal task of his own. The majority declines to apply this controlling standard, instead relying on uniforms and permission to engage in outside employment, as well as belligerent, yet not criminal, behavior.
¶ 40. As the majority emphasizes, it is clear that a law enforcement officer has the authority to make an arrest when he witnesses a crime, or under other statutorily-outlined circumstances, just as does a private citizen. Miss.Code Ann. § 99-3-7 (Rev.2007). Yet, the majority points to no crime that Cox witnessed; rather, it points to mere belligerence as allowing Cox to morph into “law enforcement mode.” Furthermore, most of the cases cited by the majority and the Court of Appeals deal with police officers who were privately employed and did indeed witness an actual crime, such as battery or shoplifting, and responded to the crime, unlike this case in which the assertion seems to be that maybe Cox was possibly worried that maybe a crime would perhaps potentially occur. See S.D. v. State, 11 So.3d 401, 402-03 (Fla.Dist.Ct.App.2009) (Officer broke up a fight (assault and battery, disturbing the peace), separated the combatants, and escorted one off the premises, preventing her from returning(trespassing)); Salt Lake City v. Christensen, 167 P.3d 496 (Utah Ct.App.2007) (officer knew defendant was a domestic violence suspect, defendant threatened to murder his brother upon release, threatened a nurse attempting to help him with physical violence, then swung at and missed the officer, before the officer restrained him and was kicked and wrestled with); Davis v. Commonwealth, 44 Va.App. 562, 605 S.E.2d 790 (2004) (officer was in process of arresting defendant for possession of illegal drugs after officer saw defendant in possession of heroin); State v. Graham, 130 Wash.2d 711, 927 P.2d 227 (1996) (stating that “a police officer is a public servant or peace officer who has the authority to act as a police officer whenever the officer reasonably believes that a crime is committed in his or her presence, whether the officer is on or off duty” (emphasis added)) (officers with extensive narcotics training witnessed defendant with large wads of cash and a plastic bag containing white pebbles believed to be cocaine); State v. Wilen, 4 Neb.App. 132, 539 N.W.2d 650 (1995) (officer smelled alcohol on a person who, shortly thereafter, *709 was involved in an automobile accident, which officer went to investigate). In this case, Cox did not witness a potential crime until the gun was fired, after which, he arguably was in “law enforcement mode.” But until the shot was fired, no potential crime had occurred. Yet, the majority and the Court of Appeals somehow determined that “Bates’s hostile reaction triggered Deputy Cox to switch into law-enforcement mode.” Maj. Op. ¶ 8. A belligerent attitude is not a crime for which Deputy Cox has an arguable legal duty to respond; rather, ejecting patrons with a belligerent attitude is part of the job of being a bouncer, and was a personal task done solely in his employment for the private employer.
¶ 41. In Florida, the statute criminalizing battery on a law enforcement officer requires that the officer be engaged in the performance of a lawful duty. See Nicolosi v. State, 783 So.2d 1095, 1096 (Fla.Dist.Ct.App.2001). Florida law allows that a police officer can be engaged in a lawful duty when working an off-duty job, as the off-duty status does not limit the “right to exercise police authority in the presence of criminal activity.” Id. (emphasis added) (internal quotations omitted). In Nicolosi, a police officer in uniform was working an off-duty job at a nightclub. Id. at 1096-97. One of his duties was checking identification, and Nicolosi attempted to obtain admission to the nightclub approximately ten times after the officer’s decision to deny her admission. Id. at 1097. After her refusal to leave, the police officer issued her a trespass warrant, which was ruled to be of no force because the area that she refused to leave was in fact a public sidewalk. Id. at 1097, 1097 n. 2. She then called the officer names, slapped the officer, and was arrested. Id. at 1097.. The court found an absence of evidence that the police officer was engaged in a lawful duty at the time of the battery, because “[n]o criminal activity or investigation of criminal activity on - the part of Nicolosi prior to the battery was proven, nor was there proof of any other activities of an official police nature, as opposed to activities exclusively for the interest of the private employer.” Id. The case at hand is similar. Cox was acting as a security guard/bouncer, and in that duty, dealing with a belligerent patron. He did not, however, encounter criminal activity or investigation of criminal activity prior to the assault, but was ejecting a patron from a bar at closing time, exclusively for the interest of his private employer.
¶ 42. Similarly, in Burney v. State, a court found that the defendant could not be convicted of battery of a police officer, because the officer was not engaged in the performance of a lawful duty when the battery occurred. Burney v. State, 93 So.3d 510 (Fla.Dist.Ct.App.2012). In Bur-ney, an off-duty officer, not in uniform, was patronizing a store. Id. at 511. The defendant, who had psychological problems, “approached the officer with apparent knowledge that the man was a law enforcement officer” and ultimately made contact with the officer. Id. The court noted that the defendant appeared to have known that the victim was a law enforcement officer and targeted him because of this fact; however, “under the language of the statute, that is not enough to transform this battery into a battery on a law enforcement officer.” Id. at 512.
¶ 43. Likewise, under the assault statute in Mississippi, mere knowledge that the victim was a law enforcement officer, and the mere wearing of the uniform, are not enough to transform the assault into an assault on a law enforcement officer. According to the plain language of the statute, the officer must be “acting within the scope of his duty, office or employment.” Miss.Code Ann. § 97-3-7 (Rev. *710 2014) (emphasis added). Thus, the element surrounds the officer’s actions at the time of the assault, i.e., whether he was performing a legal or lawful duty, not whether the alleged perpetrator knew of his status as a law enforcement officer, and not whether he had simply decided to put on his uniform. See Callahan, 419 So.2d at 174-75. The majority, however, emphasizes that “Bates clearly was aware that Deputy Cox was a police officer.” Maj. Op.- ¶ 12. Such an emphasis is misplaced, given that knowledge by the defendant that the victim is a law enforcement officer is not an element of the statute and has no bearing whatsoever on whether the officer is acting within the scope of his office or duty.[9] The majority attempts to rebut this notion by discussing Dotson v. State, 358 So.2d 1321 (Miss.1978), a case that is completely inapposite. The assault statute requires some form of intention to harm another (or put another in fear of harm), and Dotson notes that when the defendant asserts lack of intention to cause harm because.he did not realize he was given a lawful order, but thought he was being subjected to assault or tort by a private citizen, knowledge may be relevant to whether the defendant possessed the requisite intent to assault. Dotson, 358 So.2d at 1323. This is essentially allowing a defense of self-defense. Dotson has absolutely no bearing on the element of the statute regarding whether a law enforcement officer was acting within the scope of his office or duty; it only addresses the intent -to assault elements in the statute. The majority is correct — Bates did not challenge his underlying assault conviction, or any finding regarding his intent to assault. Thus, as stated in Dotson, “[w]hen there is no doubt of the defendant’s unlawful intention, knowledge of the official capacity of the victim is invariably unnecessary.” Id. at 1323. This is exactly why the majority’s emphasis on Bates’s knowledge of Cox’s official capacity is perplexing and unnecessary. Knowledge of his status is not an element in the statute and has no bearing on whether he was acting within the scope of his office and duty. Since that is the only issue before us, the majority now adds a new element to the crime, not found in the statute — knowledge of the official capacity of the victim. Such addition to the statute — requiring knowledge of the victim’s status in order to support a finding that the officer was acting within the scope of his office or duty — is new law, not found in the statute, and will in the future make it more difficult to secure a conviction of assault on an undercover officer, a plain clothes officer, or any other officer or official not readily identifiable by a uniform or the like.
¶ 44. In this case, the State failed to enter any “fact of general orders” of the police department into evidence to show that Cox was on-duty twenty-four hours a day. The State failed to enter any governmental regulations into evidence showing that Cox was on-duty twenty-four hours a day. The only evidence that the State adduced that Cox was on-duty for twenty-four hours a day was the testimony of Dana Sims, who did- not have personal knowledge of the policies of the sheriffs department before she worked there. M.R.E. 602' (“A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.”). If *711 the State wanted Sims to be able to testify as a legal expert regarding past policies, it needed to qualify her as an expert, not as a fact witness. The State woefully failed to meet its burden of proof of beyond a reasonable doubt. Moreover, even if the State did prove that Cox was on-duty twenty-four hours a day, that does not necessitate a finding that he was acting within the scope of his duty or office at the moment the assault occurred.
The fact that the general orders of a city police department provide that police officers are on duty 24 hours a day does not necessitate the conclusion that all acts taken by an off-duty police officer are deemed to be in the performance of his or her duties as a police officer; a municipality is liable only for those acts of an off-duty officer that fall within the scope of his or her employment, specifically those acts performed to enforce the law and preserve the peace.
57 Am.Jur.2d Municipal, County, School, and State Tort Liability § 387 (2012). Additionally, for liability purposes,
In determining whether the acts of an off-duty police officer may be considered within the scope of the officer’s employment for purposes of his or her employer’s liability under respondeat superior, the issue may be controlled by the existence of governmental regulations providing that police officers are always on duty, though periodically relieved from routine performance of their duty, and are required to carry firearms at all times, remain subject to orders from superior officers and calls from private citizens, and must take proper police action in any matter coming to their attentioní
Id. The State did focus on the fact that Cox had permission from the Hinds County Sheriffs Department to work off-duty. Miss.Code Ann. § 17-25-11 (Rev.2012). But permission to do off-duty work in which he is paid, supervised, and directed by a private employer, does not equate to acting within the scope of his duty and office as a Hinds County Sheriffs deputy.[10] Section 17-25-11 also provides that the Hinds County Sheriffs Department is not liable for the actions of an off-duty law enforcement officer privately employed as security, which bolsters the idea that permission does not equal duty. Id.
¶ 45. Cox was acting as a security guard/bouncer. At the direction of his private employer, he ejected an arguably belligerent patron from the bar at closing time. Indeed, when questioned by the patron, no crime was being committed. Notably, Cox did not call for police backup to eject Bates, but rather received backup from two bouncers who were not in law enforcement, bolstering the notion that he was acting as a bouncer, not as a deputy. Again, when he escorted Bates out of the bar, no crime had been committed, no criminal activity was alleged, and no criminal investigation was occurring. Cox was simply escorting a patron from the bar at the direction of the bar manager, along with two other bouncers, while they were under the control of their boss at the bar, not under the control of the Sheriff.[11] One *712 of the other bouncer/security guards even testified that getting the last people out was his job as a bouncer/seefrity guard. Common sense also belies that moving even belligerent customers out of a bar at closing time is part and parcel of the job of a bouncer. When the shot was fired, it •seems more plausible that Cox switched into law enforcement mode, as he began a criminal investigation. But at that point, the alleged assault had already occurred.
¶ 46. Cox ejected a customer from the bar under the direction and control of the bar manager, when no crime had occurred and no criminal investigation was occurring-he was performing no legal duty associated with his position as a deputy at the time of the assault. Ejecting patrons at closing time is the duty of a bouncer, not a sheriffs deputy. While “frolic” may not be an ideal word to use, because Cox was working, not “playing,” it is clear that he was working for his own personal purposes to make extra money and for the benefit of, and under the direction and control of, his private employer. The State did not produce any evidence whatsoever at trial, much less sufficient evidence, that Cox was, at the time of the alleged assault, performing a legal duty associated with his office, rather than engaging in personal business of his own or on behalf of his private employer; it merely relied on the improper testimony of Sims for the notion that Cox was always on duty and thus always acting within the scope of his duty or office. Callahan, 419 So.2d at 174-75. Thus, the State failed to meet its burden of proof on this element of Bates’s crime, and the majority conveniently sidesteps this utter lack of evidence at the trial level on the State’s part.
¶47. Therefore,, in my view, the “law enforcement officer” enhancement to Bates’s crime of simple assault should be vacated and the case remanded for resen-tencing for simple assault, of which sufficient evidence exists.

2. Nurse’s Testimony

¶ 48. This issue was not raised in Bates’s petition for certiorari and the majority does not address it. However, the Court of Appeals has promulgated incorrect law on the issue, and I believe this Court should correct that law, rather than leaving bad law on the issue as precedent.[12]
¶ 49. First, the Court of Appeals erroneously noted that “Williams was part of the team responsible for Bates’s medical care that night,” referring to the night Bates arrived at the jail. Nothing in the record demonstrates that Williams was even at work that night. Bates did not receive medical care that night. Moreover, Williams’s entire involvement in Bates’s care amounted to noting off on a doctor’s order. It further noted that “Williams had personal knowledge of the jail’s procedures for providing medical care for new inmates who require it.... Part of that procedure required Williams to read Bates’s intake form and medical records in order to be able to care for him. So it was within Williams’s personal knowledge to testify that he did not care for or medicate any burns on Bates’s body because Bates *713 made no complaint despite being given the opportunity.” The Court of Appeals’ recitation of the “facts” is a mischaracterization of Williams’s testimony. As stated, utterly no testimony as to whether Williams was on duty the night of Bates’s booking into the jail was adduced at trial. Furthermore, Williams testified that he generally relies upon intake records to provide medical care. He never testified that he reviewed Bates’s records in order to provide him medical care. He testified that he had to look at records kept by “other people” and that an intake form is the “type of document” to which he has to refer in order to provide care. Yet, he never testified that he looked at Bates’s form to provide care to him. And Williams arguably did not “provide” any care to Bates, since he never even met him, but merely “noted off’ on a doctor’s order for Bates. Williams then essentially read from the intake form. The Court of Appeals still found that Williams had personal knowledge under Mississippi Rule of Evidence 602. The State also argues that Williams’s testimony is admissible under Mississippi Rule of Evidence 808(4), which allows that statements made “for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment” are not hearsay. M.R.E. 803(4) (emphases added). It is plainly clear that the intake record was not made for the purpose of medical diagnosis or treatment, but rather for jail intake, and moreover, the intake record describes none of the issues listed, and does not do so “as reasonably pertinent to diagnosis or treatment.”
¶ 50. The record makes it abundantly clear that the State wanted to get the intake record into evidence. It appears that it may likely do so, under Rule 803(8), providing that public records and reports are an exception to the hearsay rule.[13] Or it may be able to do so under Rule 803(6) allowing the admission of records of regularly conducted business. M.R.E. 803(6). However, records of regularly conducted activity must be authenticated by the custodian or other qualified witness, or self-authenticated. M.R.E. 803(6); M.R.E. 901. The State did none of these things. Public records also must be authenticated, and may be authenticated, for example, by the testimony of a witness with knowledge, which Williams plainly is not, or by evidence that the record was indeed from the public office where items of the same nature are kept. M.R.E. 901. The State introduced no evidence as to in what office intake forms are kept, or from where the intake form came. The State simply evaded the rules of evidence by using an employee with no personal knowledge of the form and no personal knowledge of Bates to essentially read the form into the record. This was improper, and 'Williams’s testimony was improperly admitted.
¶ 51. However, the error was harmless. Upon cross-examination, the defense attorney elicited testimony from Williams that the types of injuries Bates claimed to have had were not of the type for which people normally seek medical attention. This seems obviously true. Furthermore, ample evidence aside from Williams’s testimony exists to support the conviction for simple assault, inter alia, Cox’s testimony, the testimony of the other two bouncers, the testimony of the gun' expert from the *714 crime lab, and Bates’s testimony that his gun did indeed go off.

CONCLUSION

¶ 52. Bates is correct that the State did not introduce sufficient evidence to prove that his simple assault conviction should be enhanced to simple assault on a law enforcement officer, as the State failed to put forth sufficient evidence that Cox was acting within the scope of his office or duty at the time the assault occurred. None of the evidence lent proof to the notion that Cox was performing a legal duty of his office prior to the assault. Thus, I believe this Court should reverse the enhancement to Bates’s simple assault conviction and remand the case to the trial court for resentencing for simple assault. I also believe that this Court should correct the Court of Appeals’s error in finding Williams’s testimony admissible. For those reasons, I respectfully dissent.
KITCHENS, J., JOINS THIS OPINION.

. Bates vigorously objected to her testimony being admitted, essentially arguing that her testimony that deputies were "24 hours” was legal testimony that foreclosed the jury fact issue of whether Cox was acting within his office and duty, when he was allegedly assaulted. Bates also objected because the State did not produce copies of the "policies and proce *703 dures” to which Sims repeatedly referred. At one point, the State even improperly referred to Sims as "the expert for the police department,” despite not qualifying her as one.

. These are troubling statements because the jury did not give Bates a "break;" it found that the State did not meet its burden of proof for aggravated assault. While the Legislature intended to make law enforcement officers a protected class in the assault statute, it did not intend to authorize judges to lessen or degrade the rights of criminal defendants. In this case, where the jury acquitted Bates of aggravated assault, the judge appears to have presumed that the jury did so out of the kindness of its heart, when he should have given Bates the benefit of the acquittal because the State failed to prove its case.

. There is utterly nothing in the record indicating that Williams was even at the jail on the date Bates was booked. Moreover, it is undisputed that Williams had no involvement with Bates's case until two days after his *706 intake, and then only in the form of noting off on an order.

. The statute has since been amended several times. It currently states that "Assault upon any of the following listed persons is an aggravating circumstance for charging ... if the person is: ... (a) A ... law enforcement officer ... when that person is acting within the scope of his duty, office or employment.” Miss.Code Ann. § 97-3-7 (Supp.2014).

. Taking the State’s espoused position at face value yields absurd results. For example, if an officer, while in uniform, stopped by a bar for a drink after completing his shift and had an altercation with another patron, conceivably that patron could be convicted of assault upon a law enforcement officer merely because the officer was in uniform and supposedly on call "24/7.”

. If Bates had confronted Cox at the club over a personal matter, such as Cox haying an illicit relationship with Bates’s wife, and the confrontation resulted in blows being struck, under the majority’s view, simply because Cox was in uniform and had received permission to work as private-duty security at the club, Bates could be convicted of assault upon a law enforcement officer. Such is the logical absurdity of the majority position.

.The Court addressed the 1972 version of the statute, but the pertinent language is substantially the same.

. Indeed, if knowledge is such an important part of the crime, despite the Legislature having left it out of the statute completely, it would make it difficult to ever achieve a conviction for the assault of an undercover law enforcement officer. If the Legislature deems knowledge of a person's status an important element of this crime, then this Court should respect the separation of powers and allow the Legislature to so amend the statute.

. If that were true, then all the Supreme Court law clerks who teach legal writing at Mississippi College law school with the express permission of the Court would be deemed as acting within the scope of their office and duty with the Court while teaching for Mississippi College, under the direction and supervision of Mississippi College, while being paid by Mississippi College. Thus, under the majority’s logic, if a law clerk committed sexual harassment while teaching at Mississippi College, this Court would be liable.

. Many unforseen consequences may arise from allowing Cox to be in law enforcement mode while acting as a bouncer. Such a *712 finding would seem to nullify the limitation of liability for the government for the actions of off-duty officers found in Section 17-25-11. Moreover, if Cox had been injured while acting as a bouncer at the bar, it is likely that Hinds County would be responsible for providing benefits, as he would be acting within his scope of duty and office as a Hinds County employee.

. I do not believe that this issue is reversible error in this case; however, I am concerned about the ramifications of the Court of Appeals opinion on evidentiary law.

. Matters observed by police officers and other law enforcement personnel in criminal cases are excepted from Rule 803(8). However, that appears to apply more to police reports, investigations, and confessions, rather than an intake form, which does not exactly contain matters "observed” by police officers.